**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EURUS ENERGY HOLDINGS CORPORATION, | ) |
| | ) |
| *Petitioner*, | ) |
| | ) |
| v. | ) Civil Action No. 1:25-cv-01842-RDM |
| | ) |
| KINGDOM OF SPAIN, | ) |
| | ) |
| *Respondent*. | ) |

**BRIEF FOR THE EUROPEAN COMMISSION
ON BEHALF OF THE EUROPEAN UNION AS *AMICUS CURIAE*
IN SUPPORT OF THE KINGDOM OF SPAIN**

Sally L. Pei (D.C. Bar No. 1030194)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
T: (202) 942-5000
sally.pei@arnoldporter.com

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 1

RELEVANT BACKGROUND ..................................................................................... 3

      A.      The EU State aid framework .................................................................. 3

           1.   The Commission's exclusive competence to assess the compatibility of State aid measures .................................................................................. 4

           2.   The role of national courts in the system of State aid control ............... 6

ARGUMENT ................................................................................................................ 7

I.      The Award encroaches on the Commission's exclusive competence to authorize State aid .............................................................................. 7

II.     Enforcement of the Award would place Spain in direct violation of binding EU law obligations ............................................................. 10

      A.      The Award is State aid, and Spain may not pay it unless and until the Commission authorizes payment ................................................... 10

      B.      The Commission has a demonstrated record of enforcing State aid obligations ......................................................................... 13

CONCLUSION ........................................................................................................... 17

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33 (2018) ................................. 11-12

**Treaties and International Agreements**

Treaty between the Member States of the European Communities and the
   Kingdom of Spain and the Portuguese Republic, concerning the accession of
   the Kingdom of Spain and the Portuguese Republic to the European Economic
   Community and to the European Atomic Energy Community, 1985 O.J. L
   302/9 (Nov. 15, 1985) ......................................................................................................15

Treaty on European Union, Oct. 26, 2012, 2012 O.J. (C 326) 13
   art. 17 ...............................................................................................................................1

Treaty on the Functioning of the European Union, Oct. 26, 2012, 2012 O.J. (C 326) 47
   pmbl. ................................................................................................................................3
   art. 26(2).............................................................................................................................3
   art. 107 ................................................................................................................1, 3, 4, 8
   art. 107(2)..........................................................................................................................4
   art. 107(3).........................................................................................................................4
   art. 108 .............................................................................................1, 4, 7, 11, 14
   art. 108(2)...........................................................................................................................4
   art. 108(3)................................................................................2, 5, 6, 10, 13, 16
   art. 108(4).........................................................................................................................4
   art. 109 ............................................................................................................................4
   art. 258 ...........................................................................................................................16
   art. 351 ............................................................................................................................15

**European Union Authorities**

Case C-71/04, *Administración del Estado v. Xunta de Galicia*,
   ECLI:EU:C:2005:493 (July 21, 2005)................................................................................7

Case C-199/06, *CELF v. SIDE*, ECLI:EU:C:2008:79 (Feb. 12, 2008) ...............................6, 9, 13

Case C-516/22, *Commission v. United Kingdom*,
   ECLI:EU:C:2024:231 (March 14, 2024) ..........................................................................15

Case C-284/12, *Deutsche Lufthansa AG v. Flughafen Frankfurt-Hahn GmbH*,
   ECLI:EU:C:2013:755 (Nov. 21, 2013)................................................................................7

Case C-349/17, *Eesti Pagar AS v. Ettevõtluse Arendamise Sihtasutus*,
   ECLI:EU:C:2019:172 (March 5, 2019) ...........................................................................6, 7

Case C-51/20, *European Commission v. Hellenic Republic*,
ECLI:EU:C:2022:36, (Jan. 20, 2022) ................................................................. 13-14

Case C-496/09, *European Commission v. Italian Republic*,
ECLI:EU:C:2011:740 (Nov. 17, 2011)...................................................................14

Case C-576/18, *European Commission v. Italian Republic*,
ECLI:EU:C:2020:202 (March 12, 2020) ...............................................................14

Case C-387/17, *Fallimento Traghetti del Mediterraneo*,
ECLI:EU:C:2019:51 (Jan. 23, 2019) .................................................................. 5-6

Case C-314/85, *Foto-Frost v. Hauptzollamt Lübeck-Ost*,
ECLI:EU:C:1987:452, (Oct. 22, 1987)....................................................................6

Case C-574/14, *PGE Górnictwo I Energetyka Konwencjonalna S.A. v. Prezes
Urzedu Regulacji Energetyki*, ECLI:EU:C:2016:686 (Sept. 15, 2016) ................. 6-7

Case C-275/10, *Residex Capital IV CV v. Gemeente Rotterdam*,
ECLI:EU:C:2011:814 (Dec. 8, 2011) ......................................................................7

Commission Decision (EU) 2025/1235 of 24 March 2025 on the measure State
aid SA.54155 (2021/NN) implemented by Spain—Arbitration award to Antin .....8, 10, 11, 12

Commission Notice on the enforcement of State aid rules by national courts,
2021 O.J. C 305/1 (30 July 2021).......................................................................6, 7

Commission Notice on the recovery of unlawful and incompatible State aid,
2019 O.J. C 247/2 (23 July 2019) .........................................................................13

Council Regulation (EU) 2015/1589 of 13 July 2015 laying down detailed rules
for the application of Article 108 of the Treaty on the Functioning of the
European Union, 2015 O.J. L 248/9
art. 4 .......................................................................................................................4
art. 6 .......................................................................................................................4
art. 7 .......................................................................................................................4
art. 9(2)...................................................................................................................4
art. 9(3)...................................................................................................................5
art. 9(4)...................................................................................................................5
art. 9(5)...................................................................................................................5
art. 29(2).................................................................................................................7

Decision on State aid SA.40348 (Nov. 10, 2017)..........................................................10

**Other Authorities**

Database of ICSID Member States, ICSID..............................................................................15, 16

Press Release, April infringements package: key decisions,
    European Commission (April 28, 2026)...............................................................16

**INTEREST OF AMICUS CURIAE**

The European Commission is an institution of the European Union (the "EU" or "Union"), a treaty-based international organization composed of 27 Member States.[1] The Commission is an independent institution and acts in the interests of the Union as a whole, rather than individual Member States. Under Article 17(1) of the Treaty on European Union ("TEU"), Oct. 26, 2012, 2012 O.J. (C 326) 13, the Commission "shall ensure the Union's external representation"—*i.e.*, it is responsible for, inter alia, representing the Union in proceedings outside the EU. The Commission submits this amicus brief in this function on behalf of the European Union.

The Commission is also the institution of the EU responsible for the enforcement of EU rules on public support, known as "State aid," under Articles 107 and 108 of the Treaty on the Functioning of the European Union ("TFEU"), Oct. 26, 2012, 2012 O.J. (C 326) 47. The Commission thus speaks with institutional authority about its exclusive competence to authorize State aid measures by Member States, how the arbitral award at issue in this case encroaches on that competence, and how an order enforcing the award would compound that problem. The Commission is also uniquely positioned to inform the Court about recent developments in its enforcement of EU State aid obligations that are relevant to the practical consequences that would follow from an order enforcing the award.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Petitioner in this case seeks to enforce an arbitral award granting Eurus Energy Holdings Corporation ("Eurus") approximately €106 million in compensation for Spain's 2013 modifications to a renewable energy support scheme that it had established in 2007 ("Award").

---

[1] These Member States are Austria, Belgium, Bulgaria, Croatia, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, and Sweden.

1

That award of compensation implicates the EU legal framework on State aid—a framework that the Commission is charged with enforcing. The Commission submits this brief to ensure that this Court has accurate and complete information about the scope of the Commission's competence in this area, as well as about the content of relevant rules of EU State aid law and the practical consequences that enforcement of the Award would set in motion under EU law.

First, with regard to the Commission's competence, it is a basic principle of EU State aid law that the Commission alone has authority to determine whether a State aid measure is compatible with the EU internal market and can lawfully be paid. In awarding compensation for the 2013 withdrawal of Spain's renewable energy subsidies, and in treating pre-2013 subsidy payments as a lawful baseline for measuring Eurus's loss, the tribunal assumed a function that EU law exclusively reserves to the Commission. Neither the tribunal nor any enforcement court has the authority to make such a determination, and a judgment enforcing the Award would compound that intrusion on the Commission's institutional role.

Second, enforcement of the Award would require Spain to violate binding EU law. An award that requires a Member State to compensate an investor for the withdrawal of governmental subsidies is itself a form of State aid, subject to the same rules that governed the underlying subsidies. In particular, under Article 108(3) of the TFEU, before any such payment may be made, the European Commission—the EU institution with exclusive authority over State aid—must review and approve it. Unless and until that authorization is granted, Article 108(3) provides that payment is unlawful. Consistent with its obligations under EU law, Spain notified the Award to the Commission on January 13, 2023, initiating a formal review that remains ongoing. A judgment by this Court directing payment before that review has concluded would require Spain to violate its EU law obligations and would expose Spain to legal action both by the Commission and by national courts within the European Union. These are not abstract or remote consequences. The

Commission has an established record of enforcing State aid obligations, and has recently initiated infringement proceedings against Belgium arising out of that Member State's recognition of awards of this character.

**RELEVANT BACKGROUND**

**A.      The EU State aid framework**

The EU was built on the premise that removing barriers to trade and competition among Member States and fostering a market-based economy would promote economic progress and improve living conditions throughout Europe. *See* TFEU pmbl. Central to that project was the establishment of the "internal market," defined as "an area without internal frontiers in which the free movement of goods, persons, services and capital is ensured … ." TFEU art. 26(2). But free movement alone is insufficient. The internal market must also function as a level playing field. The EU Treaties thus provide for the close regulation of governmental measures that have the potential to distort competition by providing subsidies or preferential treatment to certain industries or companies.

Article 107 of the TFEU generally prohibits State aid—defined as "any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods … in so far as it affects trade between Member States"—as "incompatible with the internal market." State aid rules apply regardless of the nationality of the recipient of the aid. The prohibition is against the provision of aid by Member States that may distort competition within the EU; such distortion may occur regardless of whether the aid is granted to an EU or foreign (non-EU) business. However, recognizing that some State aid measures may pursue public interests that prevail over the possible distortion of competition, Article 107 identifies specific situations in which, for public policy reasons, State aid is or may be considered to be compatible with the internal market. TFEU

3

arts. 107(2), 107(3).

### 1.    The Commission's exclusive competence to assess the compatibility of State aid measures.

Through Article 108 of the TFEU, the Member States have conferred on the Commission the exclusive mandate to determine whether a State aid measure is compatible with the internal market and may be implemented. Subject to certain enumerated exceptions not relevant here,[2] a Member State that plans to grant State aid must notify the Commission of its intent to do so. Upon notification, the Commission will conduct a preliminary investigation, during which it will evaluate whether or not the specific measure constitutes aid within the meaning of EU State aid rules and, if so, whether the aid is compatible with the internal market, or whether doubts remain as to the compatibility of the notified measure. Council Regulation (EU) 2015/1589 of 13 July 2015 laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union, 2015 O.J. L 248/9, art. 4(1)-4(4) ("Regulation").

If there are doubts as to the compatibility of the aid measure, the Commission will open a formal, in-depth investigation. TFEU art. 108(2); Regulation art. 6. This is a rigorous process that requires a case-by-case analysis. The Member State concerned is invited to submit comments, as are interested third parties. Regulation art. 6, 7. The Commission itself also conducts a detailed legal and technical analysis. At the end of its investigation, the Commission will adopt a formal decision. The Commission may decide that the notified measure does not constitute State aid. Regulation art. 9(2). If the measure at issue is found to constitute State aid, however, there are three possible outcomes. *First*, the measure may be found compatible with the internal market, in

---

[2] Article 109 of the TFEU allows the European Council, "on a proposal from the Commission and after consulting the European Parliament," to identify categories of aid that are exempt from notification requirement. *See also* TFEU art. 108(4) (authorizing the Commission to adopt regulations relating to categories of State aid that the Council has determined may be exempted from the notification procedure).

4

which case the Member State may implement it. Regulation art. 9(3). *Second*, the measure may be found compatible with the internal market subject to conditions set out in the decision. Regulation art. 9(4). *Third*, the measure may be found incompatible with the internal market, and therefore may not be implemented. Regulation art. 9(5). If the Commission finds an aid measure incompatible with the internal market, it will order the Member State to recover any aid that has already been paid. The purpose of this recovery obligation is to restore the situation that existed in the internal market before the aid was paid by forcing its recipient to forfeit the advantage that it enjoyed over its competitors.

During the Commission's review, "[t]he Member State concerned shall not put its proposed measures into effect until this procedure has resulted in a final decision." TFEU art. 108(3); *see also* Regulation art. 3. This obligation to refrain from implementing State aid measures until the Commission has determined that it is compatible with the internal market is known as the "standstill obligation." The standstill obligation applies regardless of the source of the payment obligation. Any State aid that a Member State has paid before the Commission has made its compatibility determination is "unlawful State aid."

The distinction between *incompatible* and *unlawful* State aid is important. "Incompatible" aid is State aid that the Commission, after analysis, has found not to meet any of the enumerated public policy standards for permitting payment of aid that distorts or threatens to distort competition in the internal market. "Unlawful" aid, on the other hand, is any aid measure implemented in violation of the standstill obligation. The unlawful aid may ultimately be found to be compatible with the internal market, but as the CJEU has explained on numerous occasions, it is the fact of payment without approval by the Commission, in violation of the standstill obligation, that renders it unlawful, and a subsequent finding of compatibility does not remedy that unlawfulness. *See* Case C-387/17, *Fallimento Traghetti del Mediterraneo*, ECLI:EU:C:2019:51,

¶ 59 (Jan. 23, 2019); Case C-199/06, *CELF v. SIDE*, ECLI:EU:C:2008:79, ¶ 40 (Feb. 12, 2008).

### 2.    The role of national courts in the system of State aid control.

No national court, foreign court, or arbitral tribunal has the authority to approve a State aid measure or to declare it compatible with the internal market. However, the national courts of EU Member States play a complementary role in the State aid system. While the Commission has exclusive competence to assess the compatibility of State aid measures, national courts play an important role in safeguarding the rights of third parties that are affected by a Member State's payment of unlawful State aid, including where the Commission has not yet issued a final decision.

In particular, national courts have an obligation to enforce the Article 108(3) standstill obligation. National courts must take all appropriate actions, in accordance with their national laws, to address the consequences of a breach of the standstill obligation. *See, e.g.*, Case C-349/17, *Eesti Pagar AS v. Ettevõtluse Arendamise Sihtasutus*, ECLI:EU:C:2019:172, ¶¶ 88-89 (March 5, 2019). Thus, for example, if a Member State makes payments of aid to a beneficiary, a third party (such as a competitor of the beneficiary that believes it has suffered a competitive disadvantage) may challenge those payments before national courts.

The national court will assess whether State aid exists. While national courts have jurisdiction to make this assessment, they must refrain from taking decisions that conflict with decisions of the Commission, and (unlike EU courts) they do not have the power to invalidate the Commission's decisions. *See* Commission Notice on the enforcement of State aid rules by national courts, 2021 O.J. C 305/1 (30 July 2021), ¶ 45 ("Notice"); Case C-314/85, *Foto-Frost v. Hauptzollamt Lübeck-Ost*, ECLI:EU:C:1987:452, ¶ 20 (Oct. 22, 1987). Thus, as the CJEU has confirmed, to the extent the Commission has already rendered a decision on the existence of State aid, that decision is controlling. *See, e.g.*, Case C-574/14, *PGE Górnictwo I Energetyka Konwencjonalna S.A. v. Prezes Urzedu Regulacji Energetyki*, ECLI:EU:C:2016:686, ¶¶ 33, 36-37

(Sept. 15, 2016). Where doubts arise, national courts may seek guidance or clarification from the Commission on the existence of State aid or a preliminary ruling from the Court of Justice. Notice ¶ 46. The Commission also has a standing right to participate as *amicus curiae* in national court proceedings about the application of State aid rules. Regulation art. 29(2); *see also* Notice ¶¶ 120-126. This standing right to participate is especially noteworthy because the Commission does not generally have a standing right to appear in national courts; its power to do so in the area of State aid underscores the Commission's exclusive authority in this sphere and the importance of a coherent, uniform application of State aid rules within the EU.

If the national court concludes that State aid exists, it must then consider whether there has been a breach of the standstill obligation. If a breach is found, the national court must draw the necessary consequences of the unlawful payment, including by ordering recovery of the unlawfully paid amount. *See, e.g.*, Case C-71/04, *Administración del Estado v. Xunta de Galicia*, ECLI:EU:C:2005:493, ¶ 49 (July 21, 2005); Case C-275/10, *Residex Capital IV CV v. Gemeente Rotterdam*, ECLI:EU:C:2011:814, ¶¶ 29, 43 (Dec. 8, 2011); Notice, ¶ 76. The national courts' duties in this regard are mandatory. They must provide parties affected by the payment of unlawful aid the "certain prospect" that all appropriate actions will be taken to remedy a violation of the standstill obligation. Case C-284/12, *Deutsche Lufthansa AG v. Flughafen Frankfurt-Hahn GmbH*, ECLI:EU:C:2013:755, ¶ 30 (Nov. 21, 2013). *See also Eesti Pagar*, ECLI:EU:C:2019:172, ¶ 89.

## ARGUMENT

### I.   The Award encroaches on the Commission's exclusive competence to authorize State aid

As explained above, under Articles 107 and 108 of the TFEU, the Commission has sole prerogative to determine whether a measure constitutes State aid that is compatible with the

internal market. The Award invades this exclusive competence, and enforcement of the Award by this Court would exacerbate the encroachment on the Commission's authority.

The tribunal awarded compensation to Eurus for damages incurred as a result of Spain's modifications to its renewable energy subsidy scheme. By doing so, the Award created an entitlement to payment that would effectively reinstate the benefit of the subsidies themselves. *See* Commission Decision (EU) 2025/1235 of 24 March 2025 on the measure State aid SA.54155 (2021/NN) implemented by Spain—Arbitration award to Antin, ¶ 212 ("*Antin* Decision"). Though the tribunal disclaimed any intention to exercise powers expressly conferred on the Commission, Decision on Jurisdiction and Liability, ¶ 236, ECF No. 1-1, Ex. A (Annex A) ("Decision")[3], it in fact made several findings that encroached on the Commission's exclusive authority to assess the compatibility of State aid.

In particular, although the tribunal held that "under EU law and the law of Spain, [Eurus] could not legitimately have expected that the [subsidies under the 2007 regime] were, for certain, lawful"—particularly since those subsidies had never been notified to the Commission, much less approved by it as compatible with the internal market—the tribunal also held that the Commission had never specifically decided that the 2007 subsidies were "unlawful" (or incompatible). Decision ¶¶ 428-29. The tribunal thus held that Eurus had an entitlement to the amount of subsidies that it had actually received before 2013—and therefore that Spain's measures to claw back amounts already paid to Eurus breached the ECT. Decision ¶¶ 428-30. In so holding, the Tribunal implicitly treated the pre-2013 payments as a lawful baseline for measuring Eurus's loss. That determination presupposes the compatibility of such payments with EU law, and is one that only the Commission is empowered to make.

---

[3] The Tribunal incorporated its Decision on Jurisdiction and Liability into the Award. *See* Award, ¶ 5, ECF No. 1-1, Ex. A.

The tribunal further opined that, absent compensation from the tribunal, "continuing investors such as the Claimant are disadvantaged as compared to those who benefited from the [pre-2013] subsidies but sold their investment prior to the introduction of the [2013 amendments]," insofar as the Commission has not sought disgorgement of those subsidies from all recipients. Decision ¶ 431. But the prohibition on subsidies that favor certain companies over others is the core of State aid control, which rests firmly within the Commission's mandate. To the extent they believed they were disadvantaged, Eurus and other similarly situated investors were free to initiate proceedings in national courts for recovery of unlawful aid paid to their competitors. *CELF*, ECLI:EU:C:2008:79, ¶ 55; *see supra* pp. 6-7. It was not for the tribunal to remedy what it apparently viewed as a competitive imbalance in the EU internal market by awarding compensation to Eurus.

Enforcement of the Award by this Court would compound the infringement of the Commission's exclusive competence. A U.S. judgment directing payment would constitute a second, independent act compelling Spain to make a payment that EU law prohibits until the Commission has completed its review of the Award. The Commission is currently conducting that review. Ordering payment before that process has concluded does not merely create conflicting legal obligations; it also undermines the purpose and practical effect of the Commission's review, as well as the system of State aid control as set out in the EU Treaties.

The Commission takes no position in this brief on whether the tribunal had jurisdiction to issue the Award, or on the validity of the Award as a matter of international law. But whatever authority the tribunal possessed to adjudicate Eurus's claims, neither the tribunal nor any enforcement court has the authority to perform the compatibility determination that EU law exclusively reserves to the Commission.

9

II.    **Enforcement of the Award would place Spain in direct violation of binding EU law obligations**

A.    **The Award is State aid, and Spain may not pay it unless and until the Commission authorizes payment**

In 2007, Spain enacted a support scheme to foster electricity production from renewable sources, which the Commission has since found constituted State aid. *Antin* Decision ¶¶ 214-15. Spain later amended that scheme beginning in 2013, reducing the levels of support and incentives that would be offered to support renewable electricity generation.

As explained above, EU Member States are generally prohibited from providing businesses with governmental support unless and until the Commission has concluded that such support is compatible with the internal market. Spain belatedly notified the 2013 scheme to the Commission, and on November 10, 2017, the Commission issued a decision declaring that the support scheme, as amended in 2013, was State aid that was compatible with the internal market. Decision on State aid SA.40348, ¶ 88 (Nov. 10, 2017); *see id.* p. 34.

However, the Commission also observed that many investors had brought investor-State arbitration claims against Spain, challenging the 2013 scheme. *Id.* ¶ 159. The Commission found that "any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the [2007 Scheme] by the notified [2013] scheme would constitute in and of itself State aid." Such compensation "would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation." *Id.* ¶ 165. The Commission recently reiterated this finding in a State aid decision involving another investor-State arbitral award—*Antin Infrastructure Luxembourg S.à.r.l. v. Spain*—that similarly arose out of Spain's 2013 modifications to the 2007 scheme. Spain notified the *Antin* award to the Commission, and the Commission issued a formal decision in 2025, confirming that an award of compensation based

10

on the 2013 amendments itself constituted State aid that had to be approved by the Commission before it could be paid. *Antin* Decision ¶ 275.

This case presents the same situation. Eurus brought claims against Spain under the Energy Charter Treaty, contending that the 2013 amendments deprived it of a level of support to which it claimed to be entitled under the 2007 scheme. The tribunal held that Spain had breached the Energy Charter Treaty to the extent that the 2013 amendments entailed the "retro-active claw back" of subsidies that had already been paid under the 2007 scheme. Decision ¶ 467(c). The tribunal awarded Eurus €106.2 million in compensation for that breach. Award ¶ 158(1).

Consistent with its obligation under Article 108 of the TFEU, and in line with the Commission's finding that an award granting compensation for losses resulting from Spain's 2013 modifications of the 2007 scheme constitutes State aid that must be notified to the Commission, Spain notified the Award to the Commission on January 13, 2023. SA.105954. As noted above, the Commission's review of the Award is ongoing. The Commission will not prejudge the ultimate outcome of its analysis. However, under the standstill obligation, Spain may not pay the Award at this time. A judgment by this Court directing payment before the Commission has completed its review would require Spain to act in violation of EU law.

The arguments that Petitioner has advanced to avoid this conclusion do not withstand scrutiny.

First, Petitioner suggests (at 23) that the Award is not State aid at all, because "controlling judicial authority has not held that the incentives here were state aid." But as noted above, the Commission has determined that the underlying 2007 scheme was State aid, and that awards like this one, that compensate investors for reduced subsidies as a result of the 2013 modifications to Spain's renewable energy scheme, are also themselves State aid. Petitioner claims that the "Commission's legal determinations lack 'conclusive weight.'" Pet. Br. 23-24 (citing *Animal Sci.*

*Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 46 (2018)). But the Commission's State aid decisions are not mere submissions or "views about the meaning of [EU] law," *Animal Sci. Prods.*, 585 U.S. at 46; they are administrative acts. While the Commission's decisions are subject to judicial review, that does not mean that Member States (or regulated parties) are free to ignore them. Just as federal agency decisions are legally binding on regulated parties unless they are successfully challenged and vacated in court, the Commission's decisions on matters of State aid are binding unless they are overturned. *See supra*.

Second, Petitioner contends (at 23) that the Award is not unlawful or "impermissible" State aid, arguing that the *Antin* decision, on which Spain relies for its State aid arguments, is distinguishable. As an initial matter, Petitioner's argument conflates incompatible and unlawful State aid. Any arguments as to the reasons for the finding of incompatibility in *Antin* are therefore beside the point. The Commission's analysis of the compatibility of the Award is ongoing, but regardless of whether the Award is ultimately found to be compatible with the internal market, until the Commission has completed its analysis, the standstill obligation applies. Any payment of the Award now, before the Commission has rendered a decision, would breach that obligation and constitute *unlawful* State aid—with all the attendant legal consequences for Spain, discussed further below.

Third, Petitioner argues (at 24) that "Spain cites nothing suggesting [approval to pay the Award] would be denied." But a hypothetical future approval does not displace the standstill obligation. The Commission has not issued any authorization to pay the Award. The Commission respectfully submits that this Court should not second-guess the outcome of the Commission's pending investigation and force Spain to act now in violation of its EU law obligations.

12

**B.    The Commission has a demonstrated record of enforcing State aid obligations**

Unauthorized payment of the Award—whether pursuant to the Award itself or a judgment from an enforcement court—would expose Spain to potential infringement proceedings brought by the Commission. Courts in Spain may also be faced with claims by competitors of Eurus who have not benefited from such unauthorized subsidies and thus are placed at a competitive disadvantage, *CELF*, ECLI:EU:C:2008:79, ¶ 55. Spanish courts would be required to order the recovery of unlawful State aid that was paid in the absence of Commission authorization. As noted above, the national courts of Member States are required to enforce the Article 108(3) standstill obligation; they have no discretion in this matter.

If the Commission ultimately decides, at the end of its investigation, that payment of the Award is incompatible with the internal market, the Commission will order Spain to recover (i.e., claw back) those payments. *See* Commission Notice on the recovery of unlawful and incompatible State aid, 2019 O.J. C 247/2, ¶ 17. The recovery process entails close monitoring and coordination between the Commission and the Member State. *Id.* ¶ 65. But it may also lead to national-court litigation, such as if the beneficiary refuses to pay back the aid or challenges the recovery decision, *id.* ¶¶ 141-142, or if recovery requires resort to insolvency proceedings, *id.* ¶¶ 127-135. Failure to recover funds would expose Spain to legal action by the Commission and possible financial penalties. *Id.* ¶¶ 148-158.

Petitioner attempts to brush aside these consequences as "pure speculation." Pet. Br. 18. But these are not merely abstract or hypothetical risks. The Commission frequently enforces State aid law against Member States that fail to comply with their State aid obligations. For instance, in *European Commission v. Hellenic Republic*, the Commission determined in March 2014 that Greece had granted unlawful and incompatible State aid to a mining company undergoing privatization. Case C-51/20, *European Commission v. Hellenic Republic*, ECLI:EU:C:2022:36, ¶

13

9 (Jan. 20, 2022). The Commission ordered recovery of the aid. *Id.* In 2019, Greece had still not complied with that obligation, and the Commission initiated infringement proceedings. *Id.* ¶ 22. The CJEU held that Greece had failed to fulfill its obligations and imposed periodic penalties in the amount of EUR 4,368,000 every six months, as well as a lump sum penalty of EUR 5,500,000.

Those infringement proceedings were not an isolated example; the Commission has sought, and the CJEU has imposed, penalties for failure to comply with State aid recovery obligations on numerous other occasions. *See, e.g.*, Case C-576/18, *European Commission v. Italian Republic*, ECLIÆU:C:2020:202 (March 12, 2020) (imposing daily penalty of EUR 80,000 and lump sum penalty of EUR 7,500,000 on Italy for failing to recover unlawful aid granted to the hotel industry); Case C-496/09, *European Commission v. Italian Republic*, ECLI:EU:C:2011:740 (Nov. 17, 2011) (imposing periodic penalties and lump sum penalty of EUR 30 million for failure to recover unlawful aid granted to promote employment).

Petitioner attempts to distinguish these cases by pointing to the fact that the Commission has not yet taken measures against Spain in connection with this Award. Pet. Br. 18. But that is precisely because the Commission's review of the compatibility of the Award with the internal market is still ongoing. As explained above, if the Commission concludes that the Award is not compatible with the internal market, it will order Spain to recover amounts unlawfully paid in violation of the standstill obligation.[4] Spain is also at risk of legal proceedings before national courts, which have a mandatory duty to enforce the standstill obligation. *See supra*.

---

[4] The Commission is aware that Spain has paid one award arising from the same renewable energy scheme at issue in this case through a voluntary settlement, contrary to the Article 108 standstill obligation. In that case, the then-Director General of the Directorate-General for Competition (a policy division of the Commission) acknowledged that, if Spain wished to avoid further enforcement litigation arising from that award in the United States and elsewhere, Spain had no choice but to settle the dispute. *See* Letter from Olivier Guersent to Permanent Representation of Spain to the EU, State aid—Arbitration Award to JGC Inversores (SA.102404), 14 Feb. 2025 (filed in *Blasket Renewable Investments, LLC v. Kingdom of Spain*, No. 1:19-cv-3783 (D.D.C. May 26, 2026), ECF No. 91-1). However, the letter did not authorize Spain to pay the award, nor did it deem the payment lawful. On the contrary, the letter noted that Spain was

14

Finally, Petitioner claims (at 19) that, under EU law, Spain would be excused from a violation of the standstill obligation or a violation of State aid rules because "Spain would have good cause for paying a U.S. court judgment enforcing the Award because Spain must do so to comply with its obligations under ICSID." There is no basis for that argument. Article 351 of the TFEU provides that "[t]he rights and obligations arising from [international] agreements concluded before 1 January 1958, or, for acceding States, *before the date of their accession*, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the [EU] Treaties." TFEU art. 351 (emphasis added). Accordingly, as the CJEU has explained, "for a rule of EU law to be deprived of effect as a result of an international agreement … the agreement must have been concluded before the entry into force of the EU Treaties in the Member State concerned  … ." Case C-516/22, *Commission v. United Kingdom*, ECLI:EU:C:2024:231, ¶ 64 (March 14, 2024).  Spain ratified the ICSID Convention in 1994, *see* Database of ICSID Member States, ICSID, https://icsid.worldbank.org/about/member-states/database-of-member-states (last accessed June 1, 2026), eight years after it acceded to the EU effective 1986.[5] Spain therefore would not be able to rely on its obligations under the ICSID Convention to justify noncompliance with EU State aid law or the standstill obligation.

Indeed, the Commission has recently initiated infringement proceedings against Belgium for failing to comply with its legal obligations with regard to the recognition of investor-State

---

bound by the standstill obligation, which prevents Spain from making a lawful payment before the Commission's compatibility assessment is complete. *Id.* at 2. Moreover, it specifically cautioned Spain that its review of the award remains ongoing, *id.*, and that, should the Commission ultimately conclude that the award was incompatible aid and order recovery of unlawfully paid amounts, Spain would be obliged to take all necessary legal measures to secure the immediate and effective enforcement of that decision, *id.* at 3.

[5] Treaty between the Member States of the European Communities and the Kingdom of Spain and the Portuguese Republic, concerning the accession of the Kingdom of Spain and the Portuguese Republic to the European Economic Community and to the European Atomic Energy Community, art. 2(2), 1985 O.J. L 302/9 (Nov. 15, 1985).

ICSID awards that require Spain to pay compensation to investors as a result of the 2013 modifications to the 2007 renewable energy scheme. *See* Press Release, April infringements package: key decisions, European Commission (April 28, 2026), https://ec.europa.eu/commission/presscorner/detail/en/inf_26_720. As discussed above, these awards constitute State aid. And as with Spain, Belgium's EU membership preceded its ratification of the ICSID Convention.[6] Belgium's obligations under the ICSID Convention to enforce ICSID awards therefore cannot supersede its obligations under EU law. Belgium's recognition of these awards and its authorization of enforcement in Belgium before the Commission has completed its assessment of those awards has "creat[ed] an imminent risk for Spain to be forced to pay the compensation in breach of the standstill obligation of Article 108(3) TFEU and Commission Decision SA.40348 on the renewable energy scheme." *See* Press Release, *supra*.

The Commission has been corresponding with Belgium about its failure to comply with its EU law obligations, and may refer the case to the CJEU if Belgium fails to rectify its noncompliance. As its decision to initiate infringement proceedings against Belgium shows, the Commission treats the recognition and enforcement of an award in violation of the standstill obligation as an infringement warranting proceedings under Article 258 of the TFEU. There is thus, under Union law, no basis for Petitioner's speculation that a legal obligation to pay an ICSID award justifies or excuses a Member State's failure to comply with EU State aid rules.

---

[6] Belgium has been an EU Member State since the formation of the European Economic Community in 1958. It ratified the ICSID Convention on August 27, 1970. *See* Database of ICSID Member States.

16

## CONCLUSION

The Commission respectfully urges the Court to recognize that enforcement of the Award would place Spain in direct violation of its binding obligations under EU law, and that the Commission's exclusive competence to authorize State aid—a cornerstone of the EU legal order—cannot be displaced by an arbitral award or a judgment of an enforcement court. The Commission submits that these considerations weigh against enforcement of the Award. Spain's motion to dismiss should be granted.

Dated: June 1, 2026                           Respectfully submitted,

                                              */s/ Sally L. Pei*

                                              Sally L. Pei (D.C. Bar No. 1030194)
                                              ARNOLD & PORTER
                                                KAYE SCHOLER LLP
                                              601 Massachusetts Ave., NW
                                              Washington, DC  20001-3743
                                              T: (202) 942-5000
                                              sally.pei@arnoldporter.com

                        *Counsel for Amicus Curiae*

17

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2026, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system.


                                                    */s/ Sally L. Pei*
                                                    Sally L. Pei